164 F.Supp.2d 141 (2001)
STATE POLICE FOR AUTOMATIC RETIREMENT ASSOCIATION et al., Plaintiffs,
v.
John DIFAVA, Superintendent of the Department of State Police, Ellen Philbin, Executive Director of the Massachusetts State Police Retirement Board, and Jane Perlov, Secretary of Public Safety, Defendants, and
Robert T. Devereaux et al., Intervenors, and
Equal Employment Opportunity Commission, Intervenor.
No. CIV. A. 01CV10053PBS.
United States District Court, D. Massachusetts.
September 5, 2001.
*142 *143 *144 *145 Michael C. McLaughlin, Boston, MA, for Plaintiffs.
Thomas A. Barnico, Deborah S. Steenland, Attorney General's Office, Boston, MA, for Defendants.
James B. Conroy, Jeffrey L. Levy, Donnelly, Conroy & Gelhaar, Boston, MA, Michael J. O'Brien, NY District Office, Elizabeth Grossman, Lisa Sirkin, Katherine E. Bissell, New York City, for Movants.

MEMORANDUM AND ORDER
SARIS, District Judge.
The State Police for Automatic Retirement Association ("SPARA"), a voluntary association of younger State Police Troopers, has brought a collateral attack on a permanent injunction entered in 1998 barring the State defendants from discharging State Police officers on the basis of age under the State's statutory retirement provisions. SPARA contends that the injunction violates the so-called safe harbor provision of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(j), with respect to State Police Troopers who were not named plaintiffs in the original action, and who were erroneously included within the scope of the injunction.
The Equal Employment Opportunity Commission ("EEOC") and several private individuals (many of whom were plaintiffs in the original age discrimination action) intervened in defense of the injunction.
Before the Court are four motions: SPARA's second motion for a preliminary injunction (Docket No. 52); the State defendants' motion to dismiss (Docket No. 70); intervenor EEOC's motion to dismiss (Docket No. 59); and the private intervenors' motion to dismiss (Docket No. 63). For the reasons stated below, SPARA's motion for a preliminary injunction is DENIED, and the motions to dismiss are ALLOWED.

I. BACKGROUND
Pursuant to Chapter 412 of the Massachusetts Acts of 1991, the Metropolitan District Commission ("MDC") Police and Registry of Motor Vehicles Law Enforcement Division ("Registry Police"), along with the Capitol Police, were merged with the Division of State Police to form the consolidated Department of State Police. See 1991 Mass. Acts. ch. 412, § 1. Section 122 of Chapter 412, codified at Mass. Gen. L. ch. 32, § 26(3)(a), mandated that all members of the consolidated Department of State Police retire at age 55. Prior to the enactment of chapter 412, the four law enforcement agencies were operated separately. Applicable Massachusetts statutes provided that MDC, Capitol, and Registry Police officers were required to retire at age 65. See Mass. Gen. L. ch. 32, § 69(d) (repealed by ch. 412, effective July 1, 1992). State Police officers were compelled to retire at age 50. See Mass. Gen. *146 L. ch. 32, § 26(3)(a). Chapter 412 mandated retirement at age 55 across the board, thereby adding five years to the mandatory retirement age of former State Police officers, but lopping ten years off of the tenure of former MDC, Capitol, and Registry Police officers.
On December 21, 1992, forty-five officers of the former MDC, Capitol and Registry Police brought an action in United States District Court (the "Gately action") seeking to invalidate the mandatory retirement provisions of chapter 412 as violative of the ADEA. United States District Judge David Mazzone entered a preliminary injunction in favor of the plaintiffs that enjoined the State and its officers from "dismissing or retiring plaintiffs or other officers because they are aged 55 or older ...." Gately v. Com. of Massachusetts, 811 F.Supp. 26 (D.Mass.1992) (order granting preliminary injunction) (emphasis added); Gately v. Com. of Massachusetts, 811 F.Supp. 26 (D.Mass.1992). The State appealed the preliminary injunction to the First Circuit, which affirmed the injunction in its entirety; the State then sought review from the Supreme Court, which denied certiorari. See Gately v. Com. of Massachusetts, 2 F.3d 1221 (1st Cir.1993), cert. denied, 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).
Shortly following the appeal, Judge Mazzone modified the preliminary injunction at the request of the State so that it only enjoined the State "from dismissing or retiring plaintiffs or other officers because they are age 64 or younger ...." Gately v. Com. of Massachusetts, 92-CV-13018-MA, 1993 WL 591563, at *1 (D.Mass. Nov. 23, 1993) (emphasis added). Later, the plaintiffs petitioned the Court to restore the original scope of preliminary injunction to prevent the State from retiring officers on the basis of age. Judge Mazzone modified the scope of the injunction accordingly. See Gately v. Com. of Massachusetts, 92-CV-13018-MA (D.Mass. Sept. 26, 1996) (order modifying preliminary injunction).
After a long period during which the parties attempted to effect a legislative solution without success, the individual plaintiffs and EEOC (which meanwhile had intervened as a plaintiff) moved for summary judgment and an order permanently enjoining the enforcement of a mandatory retirement age for officers of the Department of State Police. Judge Mazzone found in favor of the plaintiffs and entered a permanent injunction to prevent the State and its officers "from requiring officers of the Department of State Police to retire solely on the basis of their age." Gately v. Com. of Massachusetts, 92-CV-13018-MA, 1998 WL 518179, at *12 (D. Mass. June 8, 1998). No damages were awarded. The State did not appeal the final order.
In August 2000, Gerald A. Colletta, III, a state police lieutenant and a member of SPARA who was represented by SPARA's attorney, attempted to intervene in the Gately action and seek relief from judgment pursuant to Fed.R.Civ.P. 60(b)(5) in light of the Supreme Court's ruling in Kimel v. Florida Bd. of Regents, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("Kimel"). Judge Mazzone denied the motion to intervene and ordered the matter closed. The proposed intervenor did not appeal the denial of their motion.
SPARA and a long list of named individuals then initiated the present action in January 2001. The gravamen of SPARA's initial Complaint and First Amended Complaint was that the permanent injunction entered by Judge Mazzone in the Gately action was invalid in light of Kimel. Over SPARA's objection, this Court permitted the EEOC and certain police officers aged 50 or older to intervene.
*147 SPARA first moved for a preliminary injunction based on its reading of Kimel. The Court denied that motion, see SPARA v. Difava, 138 F.Supp.2d 142 (D.Mass. 2001), which is now the subject of an interlocutory appeal. (Docket No. 51.) The State defendants' motion to dismiss the First Amended Complaint was allowed without prejudice. (Docket No. 42.) The Court also allowed the State defendants' motion to dismiss the complaint on qualified immunity grounds, with prejudice, insofar as the plaintiffs sought monetary damages. (Id.)
SPARA amended its complaint two more times to include claims alleging that the injunction in the Gately action is invalid because: 1) the district court in the Gately action misconstrued the applicability of a safe-harbor provision in the ADEA for mandatory retirement plans for State law enforcement officers, 29 U.S.C. § 623(j);[1] 2) the blanket prohibition against requiring the retirement of any State Police officer at age 55 created a de facto class action in violation of Fed. R. Civ. 23; and 3) the injunction impermissibly lacks a termination date. Based on the new claims provided in the Third Amended Complaint,[2] SPARA has renewed its motion for a preliminary injunction.
The defendants and intervenors have opposed the renewed preliminary injunction motion and have each filed their own motion to dismiss SPARA's complaint.

II. ANALYSIS

A. Motion to dismiss standard
For purposes of this motion, the Court takes as true "the well-pleaded facts as *148 they appear in the complaint, extending [the] plaintiff every reasonable inference in [her] favor." Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir.1992) (citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir.1990)). A complaint should not be dismissed under Fed. R.Civ.P. 12(b)(6) unless "`it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir.1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

B. Res judicata
The private intervenors argue that SPARA's new claims  all of which constitute a collateral attack on the order of the district court in the Gately action  are completely forestalled by the doctrine of res judicata.
This doctrine, which bars the relitigation of matters settled in a previous action, serves numerous important interests  both public and private  including finality, repose, efficiency, maintaining respect for the judgments of the courts, and avoiding the imposition of inconsistent obligations. These ends justify a rule that generally forbids disregarding an earlier judgment, even if it is wrongly decided. See 18 C. Wright et al., Federal Practice and Procedure § 4403, at 17 (1981); Medina v. Chase Manhattan Bank, N.A., 737 F.2d 140, 143 (1st Cir.1984) ("A final judgment does not lose its res judicata effect simply because another court might consider the decision erroneous.").
"Three conditions must be met in order to justify an application of the [res judicata] doctrine: `(1) a final judgment on the merits in an earlier suit, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two suits.'" Perez v. Volvo Car Corp., 247 F.3d 303, 311 (1st Cir.2001) (quoting Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 755 (1st Cir.1994)).

1. Final judgment on the merits
The parties generally do not dispute that a final judgment on the merits was reached in the Gately action. However, some hay has been made of the fact that, following the issuance of the permanent injunction in the Gately action in 1998, the State elected not to appeal. The failure to take an appeal, even one that might have been successful, does not affect the finality of a judgment for purposes of res judicata. See United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950).

2. Identicality of causes of action
Determining whether there are identical causes of action in the two suits requires a "transactional approach." In re Iannochino, 242 F.3d 36, 46 (1st Cir.2001) (quoting Mass. Sch. of Law, Inc. v. American Bar Ass'n., 142 F.3d 26, 38 (1st Cir. 1998)); see also Restatement (Second) of Judgments ("Restatement") § 24 (1992). "This approach recognizes that a valid and final judgment in an action will extinguish subsequent claims `with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.'" Gonzalez, 27 F.3d at 755 (quoting Manego v. Orleans Bd. of Trade, 773 F.2d 1, 5 (1st Cir.1985), cert. denied, 475 U.S. 1084, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986)). Identity between causes of action "will be found to exist if both sets of claims  those asserted in the earlier action and those asserted in the subsequent action derive from a common nucleus of operative facts." Id. As long as the claims derive from the same nucleus of facts, it is *149 immaterial whether the identical legal theories were raised in the earlier action. See id.; 1B J. Moore, Moore's Federal Practice ¶ 0.410[1], at 350 (2d ed.1993) (explaining that "the `cause of action' or `claim' ... is bounded by the injury for which relief is demanded, and not by the legal theory").
The present action derives from the same set of operative facts involved in the Gately action, indeed from the merits of the district court's order in the prior action. Although SPARA's legal theory in this case offers a novel and complicated tweak on the arguments made by the State in the Gately action, the causes of action are sufficiently identical for purposes of res judicata.

3. Identicality of parties
There exists a general consensus "`in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which she has not been made a party by service of process.'" Martin v. Wilks, 490 U.S. 755, 761, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) (quoting Hansberry v. Lee, 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). "This rule is part of our `deep-rooted historic tradition that everyone should have his own day in court.'" Id. at 762, 109 S.Ct. 2180 (quoting 18 Fed. Prac. & Proc. § 4449, at 417).
However, "these principles do not always require one to have been a party to a judgment in order to be bound by it." Richards v. Jefferson County, 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996). The most prominent exception to the general principle is where "there is `privity' between a party to the second case and a party who is bound by an earlier judgment." Id. Although the privity exception is not limitless, "the term `privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term." Id. See generally Restatement, ch. 4, §§ 34-63 ("Parties and Other Persons Affected by Judgments"). Application of the term privity "represents a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion." Southwest Airlines Co. v. Texas Int'l Airlines, Inc., 546 F.2d 84, 95 n. 39 (5th Cir.) (quoting Vestal, Preclusion/Res Judicata Variables: Parties, 50 Iowa L.Rev. 27 (1964), cert. denied, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977)).
Among the types of relationships that are sufficiently close to permit a finding of privity between parties are situations where the party to the earlier action is an official or agency invested by law with authority to represent the person's interests. See Restatement § 41(d) (stating that a person is represented by a party who is "[a]n official or agency invested by law with authority to represent the person's interests"). However, the law in this area is complex and unsettled. See Richards, 517 U.S. at 802 n. 6, 116 S.Ct. 1761 ("We need not decide here whether public officials are always constitutionally adequate representatives of all persons over whom they have jurisdiction when, as here, the underlying right is personal in nature.").
As a general matter, the government's earlier representation cannot deprive a non-party of the opportunity to litigate "intensely individual rights." 18 Fed. Prac. & Proc. § 4458, at 514. See also Martin, 490 U.S. at 762, 109 S.Ct. 2180 (holding that a party can launch a Title VII collateral attack on a consent decree even though the party was aware of *150 the first suit and declined to intervene)[3]; Restatement § 41, comment d (noting that where the remedies a public official is empowered to pursue "may be interpreted as supplemental to those which private persons may pursue themselves, the official's maintenance of an action does not preclude other litigation by the persons affected."). Yet, preclusion will often apply where plaintiffs in a subsequent action assert "common public rights" or even "substantial interests quite distinct from the general interests of the entire citizenry." 18 Fed. Prac. & Proc. § 4458, at 516.
Several factors, including due process considerations, must be taken into account in determining how to strike the appropriate balance. See Restatement § 41, Reporter's Note to comment d ("Whether an action involving a public official or agency is preclusive in subsequent private litigation cannot be determined by reference to res judicata policies alone.").

a. Government's authority to act on behalf of the public
Courts have found preclusion principles applicable where the law invests an official or agency with special authority to act on behalf of the public. See, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (holding that commercial fishing associations and members, as citizens of state, are bound by prior representation of State in "their common public rights" in fishing treaty dispute); Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340-41, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) (rejecting a collateral attack on a State's representation in license proceeding that bound its citizens); EPA v. City of Green Forest, 921 F.2d 1394, 1403-04 (8th Cir.1990) (holding that a consent decree entered into by the EPA had a preclusive effect on an earlier filed private enforcement action because of the primary parens patriae role of the government in enforcing environmental law), cert. denied, 502 U.S. 956, 112 S.Ct. 414, 116 L.Ed.2d 435 (1991); City of Canton v. Maynard, 766 F.2d 236, 239 (6th Cir.1985) (holding that judgment against government entity in enforcing state law requiring fluoridation of municipal water supplies was binding on all residents because the matter adjudicated was "of general and public interest.").
It is the traditional role of the State to act as the sole defender of the validity of its own laws. See, e.g., Daggett v. Comm'n on Governmental Ethics & Election Practices, 172 F.3d 104, 112 (1st Cir.1999). Moreover, Massachusetts law is explicit in granting the Attorney General, an elected official, the exclusive right and duty to represent the Commonwealth in actions in which "official acts and doings" of State departments and officers are called into question. Mass. Gen. L. ch. 12, § 3; see also Dube v. Mayor of Fall River, 308 Mass. 12, 15, 30 N.E.2d 817 (1941). *151 This grant of authority has been interpreted to vest the Attorney General with broad discretion in representing the interests of the Commonwealth. See Feeney v. Com., 373 Mass. 359, 366, 366 N.E.2d 1262 (1977) (stating that such discretion is necessary to "establish[] and sustain[] uniform and consistent legal policy for the Commonwealth."). In the exercise of this discretion, she may adopt a litigation stance opposed by the public officials she represents. See id.; Alliance, AFSCME/SEIU, AFL-CIO v. Com. of Massachusetts, 425 Mass. 534, 537-38, 682 N.E.2d 607 (1997). She may also elect not to appeal an unfavorable judgment. See Secretary of Admin. & Fin. v. Attorney General, 367 Mass. 154, 159, 326 N.E.2d 334 (1975).
Thus, Massachusetts law creates a relationship between the State and its citizens that allows the Attorney General to bind the public through her representation in defense of the Commonwealth's laws or actions.

b. Plaintiff's assertion of rights in the absence of an explicit private cause of action
Preclusion will also be found to apply in circumstances where the party in the new action is claiming only a general duty to obey a law which itself provides no private mechanism for enforcement. See, e.g., Southwest Airlines, 546 F.2d at 100 (finding preclusion where private plaintiffs were asserting only a duty to obey an ordinance and the ordinance in question did not provide for a private right of action); Morganelli v. Bldg. Inspector of Canton, 7 Mass.App.Ct. 475, 388 N.E.2d 708 (collecting cases standing for the proposition that preclusion applies where plaintiffs have no direct private right of action and plaintiffs' interests were represented by government agency in an earlier proceeding), rev. denied, 378 Mass. 800 (1979). This rule ensures that States will be able to establish uniform application of their laws and also guards against the prospect of subjecting parties to duplicative judgments or inconsistent obligations. See Southwest Airlines, 546 F.2d at 100 ("To allow relitigation by any private litigant with a pecuniary interest in the [subject of the litigation] would open the door to recurrent, burdensome litigation.").
The plaintiffs argue that Martin v. Wilks, supra,[4] which involved a collateral attack on a consent decree by private litigants claiming their Title VII rights were violated, permits them to collaterally attack the 1998 order to preserve their rights under the ADEA. The problem with this position is that the ADEA does not provide plaintiffs with a private statutory right to sue to require the State to invoke safe harbor protection under § 623(j). Rather, it gives State and local officials the option to lawfully retire law enforcement officers pursuant to certain bona fide retirement plans. See Gately, 2 F.3d at 1228-1229 (referring to 1986 amendment); Bouras v. Town of Danvers, 11 F.Supp.2d 159, 163 (D.Mass.1998) (discussing 1996 amendment). Put another way, the safe harbor provision of the ADEA does not bestow on the individual law enforcement officer legal rights distinct from the more general interests vindicated by the State government in its defense of the Gately action. See Southwest Airlines Co., 546 F.2d at 98 ("[R]es judicata applies because [the government] represented ... the only legal interests ... regarding the enforcement of the ... ordinance").
*152 Moreover, to the extent the ADEA does provide a private cause of action, the statute only protects older workers from being passed over in favor of younger workers. Cf. Hamilton v. Caterpillar, Inc., 966 F.2d 1226, 1228 (7th Cir. 1992) ("The ADEA does not provide a remedy for reverse age discrimination."). It would be a stretch to conclude that the ADEA provides a private cause of action for younger workers complaining that their employer has failed to implement a retirement plan that mandates the retirement of older workers, even if such a plan would be lawful under § 623(j) of the ADEA. Viewed from that perspective, SPARA's attempt to relitigate the Gately action raises further preclusion concerns.

c. Due process considerations

i. Adequacy of representation
In the rear-view-mirror perspective of a res judicata dispute, one key due process consideration is whether the nonparties' interests were adequately represented by the government in the earlier action. See Arizona, 460 U.S. at 627-28, 103 S.Ct. 1382 (applying res judicata after determining that Indian tribes' interests were represented by United States in previous lawsuit); Southwest Airlines, 546 F.2d at 102 ("[The non-party's] interests were sufficiently represented by the public authorities to guarantee due process."). Cf. Restatement § 41(1)(e) (stating that non-party cannot be bound by judgment in a previous action when "[t]he representative failed to prosecute or defend the action with due diligence and reasonable prudence").
Many of the cases assessing the adequacy of government representation arise in the context of a motion to intervene. In that forward-looking mode, courts have adopted a presumption in favor of adequate government representation when the government sues as a plaintiff in its parens patriae capacity or when the government defends a statute against attack. See, e.g., Daggett, 172 F.3d at 111 n. 2 (concerning the adequacy of representation by the government under Fed.R.Civ.P. 24(a)(2)). Nevertheless, such presumptions can be refuted. See Public Serv. Co. of N.H. v. Patch, 136 F.3d 197, 207 (1st Cir.1998) (holding that an applicant for intervention must produce some tangible basis for a claim of inadequacy of representation, but the burden is ratcheted up when the government is representing its own interest in a plan or policy). Enough likelihood of conflict or divergence of interest will defeat a claim that "the applicant's interest is adequately represented by existing parties." Cotter v. Massachusetts Ass'n of Minority Law Enforcement Officers, 219 F.3d 31, 35 (1st Cir.2000) (finding inadequate representation where government was unlikely to defend affirmative action based on deficiencies in current testing, rather than past discrimination).
In a case such as Gately, where the State is defending the validity of its own statute, SPARA must demonstrate a divergence of interest or inadequacy of representation sufficient to raise due process and fairness concerns. SPARA, which claims to demonstrate that such divergent interests are evident here, presents (for the first time in its Third Amended Complaint) an argument concerning the validity of the mandatory retirement law which is more compelling and nuanced than the approach taken by the State in the Gately action.
SPARA now contends that the ADEA's safe-harbor provision could be read to save the Massachusetts mandatory retirement law insofar as it applies to individuals who were already State Police Troopers at the time of the consolidation in 1991 and who, as a consequence of the 1991 law, actually *153 had their mandatory retirement age raised. As one court has stated, "[t]he drafters of the exemption were not concerned with changes in state law that placed law enforcement officers in a better position with respect to mandatory retirement, only with changes that made things worse." Bouras, 11 F.Supp.2d at 163 (Stearns, J.). The EEOC agreed in a submission to the Court that such a differentiation would, in its opinion, be lawful, and state police officers might well have persuasively used that argument in the Gately litigation to support an intervention motion.[5]
Yet, SPARA's new argument, standing alone, fails to show that in the Gately action the State was operating under an actual conflict of interest, that the State refused to press obvious arguments in defense of the statute, or that the state failed to act with due diligence. See Daggett, 172 F.3d at 112. If anything, the State's litigation approach fully supported those younger officers that favored enforcement of the lowest possible mandatory retirement law available under the consolidation statute, i.e., age 55.
While the State and the younger troopers had identical interests in defending the *154 validity of the consolidation statute, their interests do seem to diverge somewhat from the State's to the extent the troopers might want to distinguish themselves from other officers as a viable back-up position. However, the State's across-the-board strategy in defending the uniform retirement age of 55 in the 1991 statute without differentiating between classes of police officers in a consolidated police agency is not unreasonable and certainly not sufficient to support a conclusion that a party's primary interests were inadequately represented by the State in a previous action. See Daggett, 172 F.3d at 112 ("Of course, the use of different arguments as a matter of litigation judgment is not inadequate representation per se.") (citing Stadin v. Union Elec. Co., 309 F.2d 912, 919 (8th Cir.1962) (Blackmun, J.), cert. denied, 373 U.S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415 (1963)); accord State v. U.S. Fish & Wildlife Serv., 262 F.3d 13, 19 (1st Cir.2001) (holding that government's failure to raise certain arguments urged by the proposed intervenors in an environmental dispute did not mandate a finding of inadequate representation).
Nor does this qualify as a case in which the State has engaged in "a refusal to present obvious arguments [that is] so extreme as to justify a finding that representation by the existing party was inadequate." Daggett, 172 F.3d at 112. The State litigated the Gately action zealously: it opposed the motion for preliminary injunction; took an appeal before the First Circuit; petitioned for rehearing and rehearing en banc; sought review of the First Circuit decision before the Supreme Court; and vigorously opposed the plaintiffs' motion for summary judgment that ultimately resulted in the permanent injunction at issue here. Plus, throughout the Gately action the State consistently argued that its conduct was lawful under the ADEA's safe-harbor provision, 29 U.S.C. § 623(j), albeit without differentiating between classes of police officers. Although the State never appealed the entry of the permanent injunction in the Gately action, this cannot be attributed to collusion, conflict of interest, lack of diligence, or any other factor that might raise due process hackles. The State had been turned away by the First Circuit before, and it had ample reason to believe the pearly gates would be slammed shut again.

ii. Notice and an opportunity to participate
Another essential due process consideration is notice and the opportunity to participate. See Richards, 517 U.S. at 799, 116 S.Ct. 1761. As a general matter, "the right to be heard ensured by the guarantee of due process has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Id. (citations and quotations omitted). SPARA has not alleged that binding its members to the original judgment is somehow unfair because they were not aware of the ongoing Gately action and its potential consequences for them.[6]Cf. Gonzalez, 27 F.3d at 762 (noting that plaintiffs' lack of notice of the original suit weighs against finding adequate representation). And while SPARA now criticizes the State's failure to appeal the final Gately order in 1998, no motion to intervene was filed by SPARA at that stage, as it could have been. See Daggett, 172 F.3d at 112 (pointing out that a court can permit intervention by private citizens if the government enters into a compromise or refuses to appeal). Any claim by *155 members of SPARA that it was inadequately represented in the Gately action could also have been preserved by appealing the denial of the johnny-come-lately motion to intervene in that case.[7]See Patch, 136 F.3d at 204 ("The district court's denial of a motion for intervention ... lays the foundation for an immediate appeal."). Now, its failure to pursue such an appeal belies any claim of inadequate representation. See James v. Bellotti, 733 F.2d 989, 994 (1st Cir.1984).
On balance, these factors taken together favor dismissal of SPARA's claims under the doctrine of res judicata. First, the members of SPARA knew about the Gately action and declined to intervene or submit an amicus brief until well after the litigation had completed. Second, the government adequately defended the statute, which involved common public rights, as opposed to protected individual rights. Third, there are no new circumstances or legal landscape (Kimel notwithstanding) that cast doubt on the soundness of the district court's judgment. Finally, there is no evidence of bad faith, lack of due diligence, or an actual conflict of interest.

d. Stare Decisis
Even assuming this second action is not strictly governed by the doctrine of res judicata, as Daggett might suggest in dicta, see 172 F.3d 104, the First Circuit's opinion in Gately approving the district court's injunction is binding precedent in this Circuit. The First Circuit stated the essential principles of stare decisis are:
(1) an issue of law must have been heard and decided; (2) if an issue is not argued, or though argued is ignored by the court, or is reserved, the decision does not constitute a precedent to be followed; (3) a decision is stare decisis despite the contention that the court was not properly instructed by counsel on the legislative history, or that the argument was otherwise insufficient; (4) a decision may properly be overruled if seriously out of keeping with contemporary views or passed by in the development of the law or proved to be unworkable; and (5) there is a heavy presumption that settled issues of law will not be reexamined.
Gately, 2 F.3d at 1226. Another factor to be considered in determining whether to give an opinion stare decisis effect is whether the party was aware of the prior litigation but failed to intervene or file an amicus brief on appeal. See id.
Although the record suggests that the precise legal argument presented in the instant litigation (i.e., to create a separate category for those who were State Troopers prior to the consolidation) was not made in Gately appeal, the First Circuit was well aware of the different possible retirement dates that were applicable depending on the employer of origin when it noted: "We want to make clear, however that we do not read § 623(j)(1) as allowing those officers who may have elected to transfer out of the MDC, Registry, or Capitol Police and into the Division of State to claim the retirement age applicable to them on March 3, 1983." Id. at 1229 n. 6.[8] Yet it affirmed the district court's *156 order, which applied broadly to all state police officers. SPARA's effort to circumvent stare decisis on the ground that the State failed to make this creative argument is unavailing.
As the EEOC pointed out at the hearing, this ruling does not leave the plaintiffs without recourse. The ADEA now specifically permits State legislatures to set mandatory retirement ages for law enforcement personnel so long as the retirement age is above 55 and the retirement plan is not a subterfuge to evade the ADEA. See 29 U.S.C. § 623(j)(1)(B)(ii) & (2).

C. Miscellaneous
To the extent they are not vitiated by the Court's preclusion ruling, Plaintiffs' remaining claims and arguments can be dispensed with quickly. First, plaintiff argues that the "permanent" injunction is invalid because it does not have a termination date. A permanent injunction remains permanent after the case is closed, unless modified. See Langton v. Hogan, 71 F.3d 930, 935 (1st Cir.1995) (holding that a judgment has the force of res judicata until further order of that or of a higher court modifying that judgment). There is no requirement that a "permanent" injunction have a termination provision, although in some situations an order must be terminated when the unconstitutional conduct has been remedied. See Bd. of Ed. of Okla. City Pub. Schools v. Dowell, 498 U.S. 237, 248, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (holding that injunctions in school desegregation cases, unlike other decrees, were not intended to operate in perpetuity and should not extend beyond the time necessary to remedy the effects of past discrimination).
Second, with respect to SPARA's Count Two alleging the lack of class certification, the Federal Rules of Civil Procedure do not create independently enforceable rights upon which SPARA may sue. See In re Baldwin-United Corp., 770 F.2d 328, 335 (2d Cir.1985) (holding that Rule 23 does not create substantive federal rights); 1 J. Moore, Moore's Federal Practice § 1.05[2][b], at 1-31 (3d ed.2001). Plus, in this case no class certification was necessary because, as an intervening party to the Gately action, the EEOC had independent statutory authority sue for class-wide injunctive relief. See 29 U.S.C. § 626(b); 29 U.S.C. § 217. Private citizens also have the right to seek such relief in certain circumstances. See also Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that a court may enjoin a state official from enforcing a state statute that violates federal law in an action brought by a citizen).
Next, SPARA also asserts in conclusory fashion and by innuendo that defendants (in particular, John DiFava), have prejudice or ill will towards SPARA's members, and are playing favorites. These bare conclusions are not supported by any factual allegations in the complaint or elsewhere. To the extent plaintiffs are attempting to state a constitutional equal protection claim based on improper animus, the allegations are insufficient. Cf. Hasenfus v. LaJeunesse, 175 F.3d 68, 74 (1st Cir.1999) (dismissing claims based on barebone conclusions). They certainly do not support a claim under 42 U.S.C. § 1985(3). See Griffin v. Breckenridge, 403 U.S. 88, 101-102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (requiring a showing of "some racial or perhaps otherwise classbased insidiously discriminatory animus behind the conspirators' action.") Accordingly, Count Five, and its companion claim *157 of violation of 42 U.S.C. § 1986 in Count Six must be dismissed. Indeed, because plaintiffs do not even brief these allegations, they are deemed waived.
Finally, the claim of mootness of the injunction is without merit  particularly in light of the hotly contested nature of this litigation.

III. CONCLUSION AND ORDER
For the reasons stated above, the motions to dismiss the Third Amended Complaint (Docket Nos. 59, 63, and 70) are ALLOWED with prejudice. SPARA's second motion for a preliminary injunction (Docket No. 52) is DENIED.
NOTES
[1] That provision, which was amended in 1996, reads:

It shall not be unlawful for an employer which is a State, a political subdivision of a State, an agency or instrumentality of a State or a political subdivision of a State, or an interstate agency to fail or refuse to hire or to discharge any individual because of such individual's age if such action is taken -
(1) with respect to the employment of an individual as a firefighter or as a law enforcement officer, the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained -
(A) the age of hiring or retirement, respectively, in effect under applicable State or local law on March 3, 1983; or
(B)(i) if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after September 30, 1996; or
(ii) if applicable State or local law was enacted after September 30, 1996, and the individual was discharged, the higher of -
(I) the age of retirement in effect on the date of such discharge under such law; and
(II) age 55; and
(2) pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this chapter.
29 U.S.C. § 623(j). (Plaintiffs cite the 1998 Amendments which are not pertinent for the reasons cited by the EEOC). (See Docket 75).
[2] The Third Amended Complaint asserts claims for: a violation of ADEA § 623(j) and the Equal Protection Clause (Count One); violation of Fed.R.Civ.P. 23 (Count Two); a declaratory judgment that the application of ADEA to the Massachusetts State Police is unconstitutional (Count Three); a declaration that defendants are violating Mass. Gen. L. ch. 32 (Count Four); a conspiracy in violation of 42 U.S.C. § 1985 (Count Five); a violation of 42 U.S.C. § 1986 (Count Six); a declaration of a violation of the Equal Protection Clause of the Fourteenth Amendment (Count Seven); declaratory relief that the Gately injunction does not apply to plaintiff SPARA and its members (Count Eight); injunctive relief (Count Nine); and attorneys' fees pursuant to 42 U.S.C. § 1988 (Count Ten).
[3] The holding in Martin v. Wilks was partially abrogated by Section 108 of the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e-2(n), which provides that a judgment or consent decree in an employment discrimination case arising under the Constitution or federal civil rights laws may not be challenged in a subsequent action:

(i) by a person who, prior to the entry of the judgment ... had actual notice of the proposed judgment or order ... [and] a reasonable opportunity to present objections to such judgment or order; or (ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.
42 U.S.C. § 2000e-2(n)(1)(B). The parties have not briefed the applicability of this provision to the instant action.
[4] As noted before, the holding of Martin v. Wilks is tarnished in the civil rights area as a result of statutory abrogation.
[5] For the curious, I repeat the EEOC's position in its letter dated June 27, 2001 (Docket No. 57) at length:

[A]t the oral argument the issue of whether a police force could have two retirement ages, for different groups of officers, came up. Because of the complexity of this issue the EEOC believes an extensive discussion may clarify certain points made at the oral argument, and respectfully asks the court's indulgence on this issue. Both the 1986 amendments to the ADEA (adding the original § 4(j)) and the 1996 amendments to the ADEA (adding the current § 4(j)) allow the mandatory retirement of law enforcement officers under certain circumstances. In addition, both versions provide that mandatory retirement take place "pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this chapter." 29 U.S.C. § 4(j)(2)(1986-1993); 29 U.S.C. § 612(j)(2)(1996-2001).
Assuming, arguendo, that a state sought to consolidate two or more law enforcement agencies, "A" and "B," into Agency "C." Agencies "A" and "B" each had its own mandatory retirement age, Agency "A" at age 55, and Agency "B" at 65; each retirement age had been enacted before March 3, 1983. A state could "divide" or "bifurcate" the new, consolidated law enforcement agency, by retaining the separate retirement ages for officers coming from Agency "A" and Agency "B." Thus in consolidated Agency "C" the age of retirement would depend on which Agency the officers originally came from.
This would not be a "subterfuge" because the state would have retained the two different retirement ages. However, assuming, arguendo, that subsequent to the first consolidation the state sought to apply a single uniform retirement age to all officers in Agency "C", by enacting a law after September 30, 1996 (the effective date of the relevant 1996 amendment to the ADEA). If the state thereby lowered the age applicable to officers who came from Agency "B," the EEOC believes that this would be a subterfuge within the meaning of the ADEA. The current intent to terminate all older officers could be inferred from the enactment of such a law.
Moving away from a hypothetical, the Commonwealth of Massachusetts could have, in 1991, consolidated the four state-wide police forces into a single force, and could have required each officer to retire at their age of mandatory retirement derived from each officer's former employer. That would not have been a subterfuge to avoid the purposes of the ADEA. However, Massachusetts did not do so. If Massachusetts now re-enacts a law which lowers the age of retirement, it would be a subterfuge unless the officers from the three forces with a mandatory retirement age of 65 received a grandfathered mandatory retirement age of 65.
The EEOC believes that this argument is particularly strong in the instant matter. Such an enactment would be an end-run around nearly 9 years of litigation, and a series of court decisions holding that the Commonwealth of Massachusetts cannot use age 55 to mandatorily retire state police officers.
[6] Indeed, the record contains evidence that State Troopers were apprised of developments in the Gately litigation through the press and mailings.
[7] Although Officer Colletta was the only named party who proposed to intervene in the Gately action, Colletta was represented at the intervention hearing by SPARA's attorney. Furthermore, in arguing the motion for intervention, SPARA's attorney represented to the Court that he was appearing on behalf of all SPARA members and that the failure of SPARA to appear on the pleadings as a party seeking intervention was a mere "housekeeping matter." See Hearing Trans. at 32-33.
[8] Because the effect of the affirmed order is to eliminate any retirement age, this footnote is cryptic and its genesis unclear. Not surprisingly, the parties disagree about its meaning.